UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS MARIN RIVERA, individually, and on behalf of other members of the general public similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AGRESERVES, INC., a Utah corporation; and Does 1 through 100, inclusive,<br>Defendants. | Case: 1:23-CV-393-JLT-CDB<br><br>ORDER DENYING MOTION TO REMAND<br>(Doc. 8) |

This class action alleges that AgReserves violated several provisions of the California Labor Code, including provisions related to rest breaks, meal breaks, overtime pay, termination wages, and providing employees with accurate wage statements. (Doc. 1-1). Carlos Rivera filed this action in Kern County Superior Court on behalf of himself and similarly situated employees in California. AgReserves removed the suit to this Court based on diversity jurisdiction, 28 U.S.C. § 1332(A), as well as the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). (Doc. 1 at 3, 11.) Plaintiff requests remand of this action claiming that the "amount in controversy" requirement for federal jurisdiction is not met. (Doc. 8.) Defendant opposes the motion, (Doc. 16), and Plaintiff has filed a reply. (Doc. 17.) For the reasons below, Plaintiff's motion to remand is **DENIED**.

///

**I.   BACKGROUND**

Carlos Marin Rivera brought this class action suit in Kern County Superior Court on against his former employer AgReserves, Inc. (Doc. 1-1.) Plaintiff was employed by AgReserves as a non-exempt, hourly paid employee on three occasions (all dates are approximate): from July 28, 2017–October 6, 2017 on a seasonal basis; from April 6, 2018 to September 28, 2018 on a seasonal basis; and from January 25, 2019–October 20, 2021. (Doc. 1-1 at ¶ 19.) Plaintiff worked for AgReserves as a general laborer whose primary job duties included farm-related work. (Doc. 1-1 at ¶ 19.) Plaintiff complains that for the four years prior to the filing of this suit, Defendant failed to:

- Pay employees proper regular and overtime wages in violation of Cal. Lab. Code §§ 510, 1194, and 1198 ("wage violations");
- Provide employees compliant meal breaks or premium compensation in lieu thereof in violation of Cal. Lab. Code §§ 226.7 and 512(a) ("meal break violations");
- Provide employees with rest periods or premium compensation in lieu thereof as required by Cal. Lab. Code § 226.7 201–203 ("rest break violations");
- Provide employees with wages timely upon termination in violation of Cal. Lab. Code §§ 201–203 ("waiting time penalties"); and
- Provide employees with accurate itemized wage statements as required by Cal. Lab. Code § 226(a) ("wage statement violations").

(Doc. 1-1.) Plaintiff's complaint also includes a catch-all claim for violation of California Business and Professions Code §§ 17200, *et seq.*, for unfair business practices. (Doc. 1-1 at 16.)

Plaintiff's complaint alleges that he and other class members—described as any California employees of AgReserves from four years prior to the filing of the suit through the suit's date of judgment—"consistently" worked more than 8 hours per day and/or more 40 hours per week and were "regularly" paid their standard pay rate instead of the statutorily required time-and-a-half or double pay. (Doc. 1-1 at ¶¶ 21, 38.) As to the other violations, Plaintiff's complaint does not specify how many times or how often Defendant committed meal break violations, rest period

2

violations, termination wage violations, or wage statement violations; however, Plaintiff states that there was a "policy and practice" of all violations alleged. (Doc. 1-1 at ¶ 86.) Plaintiff seeks "general unpaid wages at the applicable wage rates and such general and special damages as may be appropriate," as well as "pre-judgment interest on any unpaid wages commencing from the date the amounts were due" and "reasonable attorneys' fees [and] costs". (Doc. 1-1 at 18.) The complaint does not estimate the amount in controversy in this case.

AgReserves removed the action to this Court. (Doc. 1.) AgReserves calculated estimates of the value of Plaintiff's claims and concluded that this Court has proper jurisdiction either due to diversity between Plaintiff and Defendant or pursuant to the Class Action Fairness Act of 2005. The Notice of Removal alleges that Plaintiff's individual claims are worth more than $75,000, and that his class claims are valued at more than $5,000,000, as required by CAFA.[1] Plaintiff contested the calculations in AgReserves's Notice of Removal. In his motion to remand, Plaintiff asserts that jurisdiction is not proper because the amounts in controversy do not meet the jurisdictional thresholds such that this case should be remanded to Kern County Superior Court. AgReserves opposes the motion to remand and, to update and support its amount in controversy estimates, provides a sworn declaration from its expert, Dr. Krock. (Docs. 16, 16-2.)[2]

## II.   LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, (1994). Only state court actions that could have originally been filed in federal court may be removed to federal court by the defendant. 28 U.S.C. § 1441(a); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

### A.   Diversity Jurisdiction under 28 U.S.C. § 1332

A district court has original diversity jurisdiction over all "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and cost," and the

---

[1] The parties do not dispute the other jurisdictional requirements of these statutes; only amount in controversy is at issue in the motion before the Court.

[2] Dr. Krock is an economist with vast class action experience who analyzed AgReserves's business records to approximate the amount in controversy for each of Plaintiff's individual and class claims. (Doc. 16-2.)

action is "between citizens of different States." 28 U.S.C. § 1332(a)(1). Federal courts "strictly construe the removal statute against removal jurisdiction" and all doubts are to be resolved in favor of remand. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). When, as here, a party removes a case to federal court under 28 U.S.C. § 1446, that party bears the burden of establishing jurisdiction exists. *Kokkonen*, 511 U.S. at 377; *Gaus* 980 F.2d at 566.

### B. Federal Jurisdiction under CAFA

Under CAFA, federal courts have original jurisdiction "over certain class actions, defined in 28 U.S.C. § 1332(d)(1), the class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84–85 (2014) (citing *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013)). "Congress enacted CAFA to 'curb perceived abuses of the class action device which, in the view of CAFA's proponents, had often been used to litigate multi-state or even national class actions in state courts.'" *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1067 (9th Cir. 2019) (quoting *United Steel v. Shell Oil Co.*, 602 F.3d 1087, 1090 (9th Cir. 2010)). The Supreme Court held there is "no presumption against removal jurisdiction [under CAFA] and that CAFA should be read 'with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.'" *Allen v. Boeing Co.*, 784 F.3d 625, 633 (9th Cir. 2015) (alteration in original) (quoting *Dart Cherokee*, 574 U.S. at 89).

"The burden of establishing removal jurisdiction, even in CAFA cases, lies with the defendant seeking removal." *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (citation omitted). A defendant seeking removal must file "a notice of removal 'containing a short and plain statement of the grounds for removal . . .'" *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (quoting 28 U.S.C. § 1446(a)). "'[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court.' '[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold,'" and "need not contain evidentiary submissions." *Arias v. Residence Inn by Marriott*, 936 F.3d 924–25 (9th Cir. 2019) (quoting *Dart Cherokee*, 574 U.S. at 87–89; *Ibarra*,

4

775 F. 3d at 1197); *see also* 28 U.S.C. § 1446(c)(2) (with certain exceptions, "the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy"). When a removing defendant shows recovery that could exceed $5 million, "and the plaintiff has neither acknowledged nor sought to establish that the class recovery is potentially any less, the defendant has borne its burden to show the amount in controversy exceeds $5 million." *Arias*, 936 F.3d at 927 (internal quotation marks and citation omitted).

"Evidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation." *Dart Cherokee*, 574 U.S. at 89. If evidence is required, "[b]oth parties may submit evidence supporting the amount in controversy before the district court rules." *Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020). Nonetheless, the removing party bears the ultimate burden of showing "by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." *Ibarra*, 775 F. 3d at 1197. This burden may be satisfied by submitting "affidavits or declarations, or other 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal,'" or by relying upon reasonable assumptions. *Id.*; *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015); *see also Arias*, 936 F.3d at 925 ("[a]n assumption may be reasonable if it is founded on the allegations of the complaint."). Removal is proper "if the district court finds, by a preponderance of the evidence, that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee*, 574 U.S. at 88 (citations omitted).

The amount in controversy is not the amount of damages that the plaintiff will likely recover, *see Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018), nor is it "a prospective assessment of defendant's liability," *Lewis v. Verizon Communs., Inc.*, 627 F.3d 395, 401 (9th Cir. 2010). Rather, it "is simply an estimate of the total amount in dispute." *Id.* Thus, the amount in controversy merely "reflects the maximum recovery the plaintiff could reasonably recover." *Arias*, 936 F.3d at 927. To determine the amount in controversy for CAFA purposes, the claims of individual members in a putative class action are aggregated. 28 U.S.C. § 1332(d)(6); *see also Standard Fire Ins. Co v. Knowles* (2013) 133 S. Ct. 1345, 1348.

///

## III.   ANALYSIS

### A.   Federal Jurisdiction under CAFA

The parties agree that the putative class has more than 100 members and that the parties are minimally diverse. In dispute is whether whether the amount in controversy exceeds the $5,000,000 required to invoke this Court's jurisdiction under CAFA. AgReserves argues that the $5 million threshold is met, relying on an aggregated amount of potential damages from Rivera's first, second, third, fourth, and fifth causes of action, as well as the claim for attorneys' fees. (Doc. 1 at 15–20; Doc. 16-2.) After Rivera challenged the amount in controversy estimates contained in AgReserves's notice of removal, AgReserves retained an expert to analyze their business data and recalculate Defendants' exposure in this suit. The expert, Dr. Krock, identified 909 putative class members and used their employment data to conclude that the amount in controversy in this case is somewhere between $5.6 million and $8.4 million. (Doc. 16-2 at ¶¶ 11, 47–49.) Rivera disputes the subtotal alleged by AgReserves for each claim.

#### 1.   Overtime Claim

Rivera's first cause of action alleges violations for failing to properly calculate the number of overtime hours worked, as well as failing to pay non-exempt employees the proper rate for those overtime hours. (Doc. 1-1 at ¶¶ 36–46.) California Labor Code section 510 requires employers to pay employees that work in excess of eight hours in a day or forty hours in a week at a rate of no less than one and a half times the regular rate of pay for an employee. *See* Cal. Lab. Code § 510(a). It also ensures a compensation rate of no less than twice the regular rate of pay when an employee works more than twelve hours in a day or more than eight hours on the seventh consecutive day of work. *Id.*

Rivera alleges that during the relevant time period, he and other class members "consistently" worked in excess of eight hours in a day, in excess of twelve hours in a day, and/or in excess of 40 hours in a week, but they were "not paid for their overtime hours". (Doc. 1-1 at ¶ 21.) Instead, AgReserves "regularly paid employees at their regular rate of pay for hours of work that were statutorily required to be compensated at an overtime rate." (Doc. 1-1 at ¶ 43.)

AgReserves's Notice of Removal calculated an amount in controversy for this claim that

assumed two hours extra of overtime per 6-day workweek per employee.  (Doc. 1 at 15–16.)  In opposing the motion to remand, however, AgReserves interprets the complaint to include claims for both *underpaid* overtime hours—which were improperly paid at the regular rate of pay—and completely *unpaid*, off-the-clock overtime hours.  (Doc. 16 at 10.)

As an initial matter, Rivera opposes this interpretation of the complaint and contends that his complaint does not allege completely unpaid, off-the-clock overtime.  (Doc. 17 at 3–5.)  AgReserves counters that it is reasonable to interpret the complaint as containing off-the-clock overtime violations.[3]  The section of the complaint describing Plaintiff's overtime wage claim does not allege that overtime hours went completely unpaid, but that putative class members were not paid for overtime at the proper rate.  (Doc. 1-1 at ¶ 21) ("Defendants regularly paid employees at their regular rate of pay for hours of work that were statutorily required to be compensated at an overtime rate.")  However, later in the complaint, Plaintiff specifies that the "number of hours worked *and/or* the corresponding hourly rates" on employees' wage statements are "inaccurate as a consequence of Defendants' failure to pay overtime wages".  (Doc. 1-1 at ¶¶ 27, 77.)  Under these circumstances, the Court finds it reasonable for AgReserves to read the complaint as alleging some completely unpaid, off-the-clock overtime hours in addition to underpaid hours.  *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019) ("An assumption may be reasonable if it is founded on the allegations of the complaint.")

AgReserves assesses the value of these off-the-clock claims by assuming 1.5 hours of unpaid, off-the-clock overtime per week for all 909 putative class members at a value of one-and-a-half times the "average rate [] calculated to be $15.99 during the class period[]."  (Doc. 16-2 at ¶¶ 36–37.)  This amounts to $1,745,988.08 for 72,795 overtime hours.  (Doc. 16-2 at ¶ 37.)  Rivera does not substantively dispute the calculation for off-the-clock claims in its reply aside from suggesting that Dr. Krock's use of an "average" wage during the class period is suspicious

---

[3] AgReserves cites to language in the complaint alleging that "Plaintiff and similarly situated employees were not paid for all hours worked *and/or* were not paid at the correct hourly rate."  (Doc. 1-1 at ¶ 29.) This paragraph of the complaint is a "general allegation" not connected to a specific claim, which may refer to one of Plaintiff's other claims.  In describing the meal break claims, for example, Plaintiff alleges that "Defendants willfully required Plaintiff and class members to work during meal periods and failed to compensate Plaintiff and class members for work performed during meal periods."  (Doc. 1-1 at ¶ 54.)

7

where the rest of his calculations used the "minimum wage". (Doc. 17 at 3–5.) The Court finds AgReserves's estimation as to off-the-clock claims to be reasonable.

As to the value of the claim for *underpaid* overtime hours, Rivera argues that AgReserves used an improper violation rate for underpaid overtime hours in its opposition. (Doc. 17 at 3.) The Court agrees. It appears from Dr. Krock's declaration that he calculated the number of unpaid overtime hours using a 100% violation rate without explanation. His declaration explains:

> To calculate potential unpaid overtime premium wages exposure, I multiplied the overtime hours worked by the minimum wage for the year in which the hours were worked and then multiplied that amount by 0.5 to account for the potential unpaid premium portion of overtime. For example, if an employee worked three hours of overtime in a week in 2020, I would multiply those three hours by the minimum wage of $13.00 in 2020 and then multiply that by 0.5 to arrive at $19.50 of potential unpaid overtime premium wages.

(Doc. 16-2 at ¶ 34.)

Dr. Krock ultimately identified 322,216.24 overtime hours worked by the 909 putative class employees. He then calculated that those overtime hours were worth $2.2 million in underpaid overtime. (Doc. 16-2 ¶ 25.) By his own explanation, Dr. Krock assumed that *all* overtime hours worked by an employee went underpaid. AgReserves argues that this 100% violation rate is acceptable because Plaintiff's complaint alleges "systemic" and "regular" overtime pay violations. (Doc. 16 at 17.)

AgReserves offers no case law supporting this violation rate. In fact, one case cited by AgReserves explains that "[t]he Ninth Circuit has held that a 'pattern and practice' does not support a 100% violation rate". *Cavada v. Inter-Continental Hotels Group, Inc.*, 2019 WL 5677846 at 5 (S.D. Cal. Nov. 11, 2019) (citing *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1198–99 (9th Cir. 2015)). Instead, courts find that "violation rates of 25% to 60% can be reasonably assumed as a matter of law based on 'pattern and practice' or 'policy and practice' allegation." *Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175, 1189 (E.D. Cal. 2020) (collecting cases).

Rivera argues that, in place of the 100% violation rate calculation, the Court should use the violation rate originally proposed by AgReserves in the Notice of Removal, which was two underpaid overtime hours per week amounting to approximately $687,181. (Doc. 17 at 16; *see*

*also* Doc. 1 at ¶¶ 67–70.) The Court agrees that two hours of underpaid overtime is a reasonable estimation based on the allegations in the complaint, and it is supported by case law. *See Andrade v. Beacon Sales Acquisition, Inc.*, No. CV1906963CJCRAOX, 2019 WL 4855997 at *3 (C.D. Cal. Oct. 1, 2019) (approving a violation rate of one hour of off-the-clock work and two hours of underpaid overtime per workweek). As such, the total estimated amount in controversy as to Rivera's overtime claim amounts to $2,433,169.08.

        2.        Meal Break Claim

Under California Labor Code §§ 226.7 and 516, employers must provide non-exempt employees working more than five hours in a shift with at least one interrupted meal break of at least 30 minutes. If an employee's total work period in a day does not exceed six hours, the meal period may be waived by mutual consent of the employer and employee. Employees working more than ten hours per day must be given a second thirty-minute meal period, unless they are working fewer than twelve hours, in which case the second meal period can likewise be waived. Employees are entitled to one additional hour at their regular pay rate for each workday in which a compliant meal period was not provided. Cal. Lab. Code § 226.7(b).

Rivera alleges in his second cause of action that AgReserves forced employees who were scheduled to work six or more hours and who had not waived their meal periods, to "work for periods longer than 5 hours without an uninterrupted meal period of not less than 30 minutes". (Doc. 1-1 at ¶¶ 52–53.) To estimate the amount in controversy as to this claim, Dr. Krock analyzed AgReserves's business records to identify the number of shifts during the putative class during the relevant time that were at least five hours in length such that they qualified for at least one meal break. (Doc. 16 at 11; Doc. 16-2 at ¶ 26.) After identifying 247,920 meal-break-eligible shifts, Dr. Krock assigned a 20% violate rate, or one missed required meal per each five shifts. For each of the 49,585 instances of missed meal periods, Dr. Krock applied one hour of pay at the lowest hourly rate earned among all class members in the applicable given year, amounting to $663,030.20.

Rivera complains that a 20% violation rate is inappropriate here because he did not allege a "policy or practice" of meal break violations. (Doc. 17 at 7–8.) Rivera's complaint states

otherwise, clearly alleging that Defendants had a "policy and practice of requiring Plaintiff and class members to work through their meal and rest periods without paying them proper compensation". (Doc. 1-1 at ¶ 86.) As such, the Court agrees with Defendants that a 20% violation rate is appropriate. *Garza v. Brinderson Constructors, Inc.*, 178 F. Supp. 3d 906, 911–12 (N.D. Cal. 2016) (holding that an assumption of one violation per week was reasonable where the plaintiff alleged that there was a "policy or practice" of meal and rest break violations and that plaintiff "regularly" missed meal and rest breaks); *Gipson v. Champion Home Builders, Inc.*, 2020 WL 4048503 at *6 (E.D. Cal. July 20, 2020) (holding that a rate of one day per workweek was reasonable because the complaint alleged a common "practice" of meal break violations).

Rivera next complains that Defendants' amount in controversy estimate is flawed because it does not consider the putative class members who executed meal waivers for shifts not exceeding six hours, including Rivera himself. (Doc. 17 at 7.) Rivera provides a sworn declaration in support of his argument, attached to which is a "New-Hire Forms Checklist" that includes the meal period waiver form. (Doc. 17-at at 4.) Rivera alleges that the meal waiver form was "part of a packet of onboarding documents" given to him on his first day of work with AgReserves, "so it follows that the waiver was provided to all new hires" and "many, if not all, class members likely signed this waiver." (Doc. 17 at 7.) For all employees who signed such waivers, only shifts in excess of *six* hours—instead of the estimated five hours—would be meal-eligible.

The Court agrees with Rivera that meal break waivers may impact the amount in controversy as to this claim. However, the flaws of AgReserves's estimations do not render them unreasonable, particularly where Rivera has not provided evidence or case law supporting an alternative number.[4]

3. <u>Rest Break Claim</u>

Rivera's third cause of action alleges that Defendants violated California Labor Code § 226.7 by failing to allow putative class members to take at least ten minutes of rest time per

---

[4] Rivera suggests that the Court make the "generous assumption" that two thirds of the five-hour shifts identified by Dr. Krock were six hours or longer, making the amount in controversy as to this claim would be $427,322.23. This alternative calculation appears wholly speculative.

10

four hours of work where employees were scheduled to work more than three and a half hours per day. (Doc. 1-1 at ¶¶ 59–67.) Rivera's complaint alleges that he and other class members are owed the rest period premium due for non-compliant rest periods, which amounts to "one additional hour of pay at the employee's regular hourly rate . . . for each work day that the rest period was not provided" and should have been. (Doc. 1-1 at ¶ 67, citing Cal. Lab. Code § 226.7(b).)

AgReserves's expert Dr. Krock analyzed business records to "identify the number of shifts for the putative class during the relevant time that would have been eligible for at least one . . . rest break, i.e., shifts of . . . 3.5 hours or more." (Doc. 16 at 11, citing Doc. 16-2 at ¶ 29.) Dr. Krock found 254,097 shifts "with more than 3.5 hours recorded in the class period" and assumed "a 20% rest [period] violation rate". (Doc. 16-2 at ¶ 30.) Dr. Krock then multiplied the number of shifts longer than 3.5 hours that each putative class member had worked by 20% and rounded up to the next whole number. He then multiplied the number of assumed rest period violations by "the minimum wage for the year in which the shift occurred to determine the value of the missed rest break premium". (Doc. 16-2 at ¶ 31.) Dr. Krock ultimately concluded that for all 909 putative class members, the total number of potential rest break violations was 50,821, valued at approximately $679,585.80. (Doc. 16-2 at ¶ 32.)

Rivera once again complains that a 20% violation rate is inappropriate because he does not allege a "pattern and practice" of rest break violations. As the Court discussed above, the complaint plainly alleges a "pattern and practice" such that a 20% violation rate is appropriate. AgReserves's estimate that rest breaks are valued at $679,585.80 is therefore well-founded and reasonable under the circumstances.

    4.  <u>Waiting Time Penalties</u>

Rivera's fourth cause of action asserts that AgReserves failed to comply with California Labor Code §§ 201, 202, which require employers to pay all compensation owed to employees at or around termination from employment. (Doc. 1-1 at ¶¶ 68–82.) Section 203 provides a penalty for employers who willfully fail to pay any wages of an employee who is discharged or quits, which includes wages that accrue from the date due up to thirty days thereafter. Cal. Labor Code

§§ 201, 202, 203. The statute imposes a three-year statute of limitations for waiting time penalties, determined from the date the complaint was filed. *Pineda v. Bank of Am., N.A.*, 50 Cal. 4th 1389, 1401 (2010).

Rivera alleges that AgReserves "failed to pay Plaintiff and other similarly situated employees all wages owed upon the separation of their employment" either "at the time of discharge, or within 72 hours of [employees'] leaving Defendants' employ." (Doc. 1-1 at ¶¶ 71, 72.) AgReserves represents that Dr. Krock identified 298 employees terminated from AgReserves within the applicable three-year statute of limitations. (Doc. 16 at 18.) Dr. Krock assumed a 100% violation rate from the complaint's allegation that "Defendants failed to pay Plaintiff and other similarly situated employees all wages owed upon separation of their employment, including unpaid overtime wages described herein." (Doc. 1-1 at ¶ 70.) Dr. Krock also assumed the maximum thirty-day penalty allowed by statute for all 298 employees, and he further assumed eight hours of work per day. (Doc. 16-2 at ¶ 38.) Using these figures, Dr. Krock estimates the value of the waiting time penalties to be $980,400.

Rivera complains that Dr. Krock's analysis improperly counted the number of "terminated" employees and assumed eight-hour workdays with no support, despite the fact that Dr. Krock had access to employees' time data and "could have easily calculated the average shift length for each of the 298 employees." (Doc. 17 at 10.) Rivera does not propose an alternate calculation for either metric but asks the court to "not credit any amount for waiting time penalties towards the CAFA amount in controversy." (Doc. 17 at 10.)

Rivera's argument as to the assumed shift length is without merit. AgReserves's Notice of Removal assumed that terminated employees worked an even longer 8.33 hours per day, (Doc. 1 at ¶¶ 83–84), a figure that Rivera did not contest in its motion for remand. As to the estimated number of affected employees, Dr. Krock's declaration explains that because "actual termination dates are unavailable," he assumed that any employee who went 42 days without recording time had been terminated. (Doc. 16-2 at ¶ 23.) The declaration further explained that in Dr. Krock's extensive experience with analyzing employee data for class action claim valuation, he has found that the 42-day threshold is "the most reliable method" for estimating termination when

1 comparing those estimates to actual termination dates as they become available.  (Doc. 16-2 at
2 ¶ 23.)  Though Rivera is correct that this assumption is imperfect, the Court finds that it is
3 reasonable as explained under the circumstances.
4     5. Wage Statement Violations
5 Rivera's fifth cause of action alleges violations of California Labor Code § 226(a).  (Doc.
6 1-1 at ¶¶ 68–82.)  Section 226(a) requires that each employer furnish employees with an "accurate
7 itemized wage statement in writing" with information such as gross wages earned, total hours
8 worked by an employee, the number of piece-rate units earned for employees paid on a piece-rate
9 basis, all deductions, net wages earned, identifying information of the employee and the
10 employer, and the like.  Cal. Lab. Code § 226(a). Under Labor Code 226, if an employer provides
11 an inaccurate or incomplete wage statement, employees may be entitled to recover $50 for the
12 initial pay period in which a violation occurs and $100 for each violation in a subsequent pay
13 period, not to exceed $4,000. See Cal. Labor Code § 226. The statute of limitation for wage
14 statement penalties is one year. See Cal. Code. Civ. Proc. § 340.
15 Rivera alleges that Defendants failed to provide employees with the complete and accurate
16 wage statements required by § 226(a) because the wage statements given to employees "did not
17 provide complete and accurate information regarding the total number of hours they worked in a
18 given pay period, the applicable hourly rates in effect during the pay period, and the
19 corresponding number of hours worked at each hourly rate."  (Doc. 1-1 at ¶ 81.)  AgReserves
20 estimates the value of these claims to be $447,221.  (Doc. 16 at 18.)  To calculate that figure,
21 AgReserves a 100% violation rate from the complaint's language that "the number of hours
22 worked and/or the corresponding hourly rates [in the wage statements provided to employees] are
23 inaccurate as a consequence of Defendants' failure to pay overtime wages, as set forth herein."
24 (Doc. 16 at 18, citing Doc. 1-1 at ¶ 77.)
25 Dr. Krock's calculation includes 500 identified class members who were given 4,721
26 wage statements during the relevant time period.  (Doc. 16-2 at ¶ 41.)  Dr. Krock's declaration
27 does not explain exactly how the 4,721 violative wage statements amount to $447,221 in potential
28 recovery for the class.  Rivera attempts to do so in its reply and concludes that Dr. Krock

13

inappropriately applied a $50 penalty rate for 500 pay periods and a $100 penalty rate for 4,220 "subsequent" pay periods. Rivera asserts that the $100 "subsequent" penalty should not be applied here, because an employer must be notified that it is violating a Labor Code provision before the "subsequent" violation rate is imposed.

Rivera cites *Patel v. Nike Retail Servs., Inc.* in support. 58 F. Supp. 3d 1032, 1042–43 (N.D. Cal. 2014). The *Patel* court extended the logic of a California Court of Appeal opinion which considered the meaning of "initial" and "subsequent" violations as used in the penalty provisions of Labor Code §§ 210 and 225.5. *Patel*, 58 F. Supp. 3d at 1042–43 (citing *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157 (2008)). The *Amaral* court concluded that, under §§ 210 and 225.5, an employer may only be subject to the higher statutory penalty for "subsequent" violations after it had been given notice that its practices violate the California Labor Code. *Id*. As such, an initial "violation" could encompass multiple failures to pay an employee under sections 210 and 225.5. *See Amaral,* 163 Cal.App.4th at 1209, 78 Cal.Rptr.3d 572 (noting that "each failure to pay each employee" may have "occurred in an initial violation"). *Patel* applied this understanding of the word "subsequent" to Cal. Lab. Code § 226 such that "subsequent" violations occur only after an employer is notified that it has previously violated § 226.

Courts in this district have disagreed as to whether *Patel*'s application of *Amaral* to § 226 was correct. In *Garnett*, the Court held that the language of § 226 differed enough from that of §§ 210 and 255.5 that *Amaral*'s interpretation of "subsequent" in the latter statutes did not apply to § 226. *Garnett v. ADT LLC*, 74 F. Supp. 3d 1332, 1336 (E.D. Cal. 2015). Specifically, the Court noted that in §§ 210 and 255.5, "subsequent" modifies "violation," whereas in § 226, it modifies "pay period". The court found that:

> [i]t is not at all clear that the *Amaral* court would have interpreted this language the same way it interpreted the language of sections 210 and 225.5. In fact, one of the parties in *Amaral* argued that sections 210 and 225.5 should be distinguished from 'examples of other statutes that expressly impose penalties 'per pay period,'' *see Amaral*, 163 Cal.App.4th at 1208, 78 Cal.Rptr.3d 572 (citing Cal. Lab.Code § 2699(f)(2)), but the court's opinion leaves ambiguous whether the court agreed with that understanding.

14

1 *Garnett*, 74 F. Supp. 3d at 1336.

2 The *Garnett* court further highlighted §§ 210 and 225.5's use of the phrase "[f]or each subsequent violation, *or any willful or intentional violation, ...*" in contrast to § 226, which does not make mention of "willful or intentional" violations. "Instead, the statute predicates all liability upon a "knowing and intentional failure by an employer to comply with subdivision (a)." Cal. Lab.Code § 226(e)." *Id*. The court went on to interpret § 226 as requiring heightened penalties for every pay period that occurs chronologically after the first pay period in which an employer fails to comply with section 226(a), regardless of whether the employer was on specific notice that their conduct violated the law before the later violations. Absent controlling authority dictating otherwise, the Court agrees with *Garnett*'s reasoning. As such, AgReserves's estimate of a $50 penalty rate for 500 pay periods and a $100 penalty rate for 4,220 "subsequent" pay periods, amounting to $447,221, is reasonable. This brings the estimated amount in controversy to $5.2 million.[5]

### B. Diversity Jurisdiction

Because the Court has proper jurisdiction under CAFA, it need not analyze whether jurisdiction is also appropriate under 28 U.S.C. § 1332(A).

///
///
///
///
///

---

[5] Because the amount in controversy exceeds the statutorily required $5 million before consideration of attorneys' fees, the Court need not determine whether AgReserves's estimate of attorneys fees is reasonable. In any event, the Court notes that AgReserves has not made any effort to meet its burden of proving the amount of attorneys' fees at stake in this action by a preponderance of the evidence. For example, AgReserves has not provided counsel's hourly rates or anticipated time expenditures from which an estimated lodestar could be calculated. *Gipson v. Champion Home Builders, Inc.*, No. 120CV00392DADSKO, 2020 WL 4048503 (E.D. Cal. July 20, 2020) (citing *Gonzalez v. Comenity Bank*, No. 1:19-cv-00348-AWI-EPG, 2019 WL 5304925, at *11 (E.D. Cal. Oct. 21, 2019) (determining a reasonable estimate for attorneys' fees based on defendant's affidavit stating counsel's hourly rate and the court's knowledge of customary rates in comparable cases); *Reyes v. Staples Office Superstore, LLC*, No. 19-cv-07086-CJC-SKx, 2019 WL 4187847, at *5 (C.D. Cal. Sept. 3, 2019) (estimating amount of attorneys' fees in controversy based on the plaintiff's attorney's admission of his hourly rate, together with the court's knowledge of customary rates and that comparable employment cases in that district tend to take between 100 and 300 hours to litigate through trial)).

### IV.  CONCLUSION

For the reasons set forth above, the Court finds that it has proper jurisdiction over the matter pursuant to the Class Action Fairness Act. Rivera's motion to remand the case to Kern County Superior Court, (Doc. 8), is **DENIED**.

IT IS SO ORDERED.

Dated:   **August 14, 2023**

UNITED STATES DISTRICT JUDGE